UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 16-CV-1275 (JFB)(GRB)

ZACARIAS RODRIGUES AND MORSMAN REALTY CORP.,

Plaintiffs,

VERSUS

THE INCORPORATED VILLAGE OF MINEOLA, *ET AL.*,

Defendants.

**MEMORANDUM AND ORDER**
June 16, 2017

JOSEPH F. BIANCO, District Judge:

Plaintiff Zacarias Rodrigues filed the Complaint in this action on March 15, 2016. (ECF No. 1.) After this Court dismissed the Complaint with leave to amend on October 25, 2016 (ECF Nos. 21–22), Rodrigues filed the Amended Complaint on November 30, 2016 (ECF No. 25 ("Am. Compl.")), which added his company, Morsman Realty Corp. ("Morsman") (collectively with Rodrigues, "plaintiffs") as a plaintiff. Presently before the Court is a motion to dismiss the Amended Complaint filed by defendants the Incorporated Village of Mineola ("Village") and Daniel B. Whalen, the Village's Superintendent of the Department of Buildings (collectively "defendants").[1] For the reasons set forth below, the motion is granted in part and denied in part. In particular, the motion is granted with respect to the claims (1) against Mayor Strauss, (2) based on the 2006 summons, and (3) against Whalen to the extent they stem from the parking citations. The motion is denied as to the claims against Whalen and the Village regarding the summonses for the building violations and as to the Village regarding the parking citations.

Accordingly, all claims in the Amended Complaint against Mayor Strauss are dismissed.

In addition, at oral argument, plaintiff conceded that the Amended Complaint fails to state any claims based on a summons he received in 2006 because the statute of limitations expired on that claim before the Complaint was filed. *See Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda*, 572 F.3d 93, 94 (2d Cir. 2009) ("[T]he statute of limitations for a claim under § 1983 that accrued in New York is three years." (quoting *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 331 (2d Cir.1997))). Therefore, the claims based on the 2006 summons are dismissed.

---

[1] The Amended Complaint also names Mayor Scott P. Strauss as a defendant, but plaintiffs have acknowledged that the claim against Mayor Strauss was based on Strauss's "involvement with respect to Plaintiffs' now dismissed claim" and, consequently, "consent to dismissing Defendant Strauss as an individual Defendant in this matter." (ECF No. 27.)

I. Background

The following facts are taken from the Amended Complaint. The Court assumes them to be true for purposes of deciding this motion and construes them in the light most favorable to plaintiffs, the non-moving party.

A. Facts

Rodrigues is of Portuguese descent. (Am. Compl. ¶ 11.) He is the sole owner and shareholder of Morsman, which owns property at 75 Windsor Avenue, Mineola, New York (the "Property"). (Id. ¶¶ 6, 13.) In 2005, plaintiffs applied for a permit to operate a concrete mixing plant on the Property, but the Village denied the application. (Id. ¶ 14.) Plaintiffs eventually entered into a stipulation of settlement with the Village whereby they were allowed to use the Property as an outdoor storage facility for the "open storage of trucks, machinery, equipment and materials . . . provided they are not used for the production of cement." (Id. ¶ 16.)

Since the time the parties entered into the stipulation, inspectors from the Village have frequently visited the Property. (Id. ¶ 17.) Several of plaintiffs' neighbors also operate storage facilities, some without permits, but they have not received frequent visits from inspectors. (Id. ¶ 18.) Plaintiffs' neighbors are not of Portuguese descent. (Id. ¶ 19.) When Rodrigues raised concerns about unfair treatment with defendant Whalen, Whalen responded, "mind your own business." (Id. ¶ 18)

On September 28, 2006, Rodrigues received a summons as owner of Morsman, which alleged that he "allow[ed] for the accumulation of filth, dirt, concrete dust and stones upon a public place (Windsor Avenue) within the Village of Mineola" in violation of the Village's Municipal Code ("Code"). (Id. ¶ 20.) Building Inspector Keith Gessner issued the summons. (Id. ¶ 21.) On July 22, 2014, Rodrigues received another summons from the Village, this one issued by Building Inspector Thomas Murphy, for "allow[ing] discharge into the Villages [sic] separate storm sewer system . . . materials other than storm water." (Id. ¶¶ 24–25.) On December 1, 2014, Rodrigues received additional summonses from the Village via Murphy for operation of a non-permitted use of a garbage corporation in an M-District and for permitting a tenant to deposit waste on private property. (Id. ¶ 32.) It was later determined that, although garbage trucks were being stored on the Property, there was no garbage being stored or dumped there. (Id.)

Plaintiffs' non-Portuguese neighbors have not received summonses even though they have spilled concrete production material onto public streets and into storm drains. (Id. ¶¶ 22, 25–26.) In addition, at least one neighbor, D&A Sand and Gravel ("D&A"), produces and stores concrete at their facility at 328 Sagamore Avenue ("328 Sagamore"), but its owner only has a permit to do so at a different facility located at 335 Sagamore Avenue ("335 Sagamore"). (Id. ¶ 30.)

Rodrigues has also received over 25 parking citations from the Village from September 2013 to February 2015 totaling over $6,000 in fines. (Id. ¶ 34.) The citations were issued for, *inter alia*, double parking and improper parking of a commercial vehicle. (See, e.g., id. ¶¶ 36–47.) Plaintiffs' neighbors have not received citations to the extent Rodrigues has even though some of them have engaged in similar behavior. (Id. ¶ 57.)

B. Procedural History

Rodrigues filed the Complaint on March 15, 2016. (ECF No. 1.) Defendants' initial motion to dismiss was granted on October

25, 2016. (*See* ECF Nos. 21–22.) Plaintiffs filed the Amended Complaint on November 30, 2016 (ECF No. 25), and defendants moved to dismiss on February 3, 2017 (ECF No. 29). Plaintiffs filed an opposition on March 28, 2017 (ECF No. 35), and defendants replied on April 11, 2017 (ECF No. 37). Oral argument was held on April 20, 2017. (ECF No. 38.) bThe Court has fully considered the parties' submissions.

## II. Standard of Review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth two principles for a district court to follow in deciding a motion to dismiss. 556 U.S. 662 (2009). First, district courts must "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

## III. Discussion

The Amended Complaint sets forth claims pursuant to 42 U.S.C. § 1983 ("Section 1983") for violations of the Equal Protection Clause of the Fourteenth Amendment and municipal liability against the Village based on its selective enforcement of laws, rules, regulations, and ordinances against plaintiffs because of Rodrigues's national origin. (Am. Compl. ¶¶ 71–76.) Specifically, plaintiffs claim that the Village selectively targeted them for both violations of the Village's Code and traffic citations. As set forth below, the Court concludes that, although the Amended Complaint fails to state a claim based on the Village's issuance of traffic citations with respect to Whalen individually, it adequately states Equal Protection against Whalen based on his alleged selective enforcement of summonses for Code violations. The Amended Complaint also adequately alleges municipal liability against the Village for both the Code violations and the parking citations.

### A. Individual Liability

As a threshold matter, defendants argue that Whalen cannot be held individually liable because (1) the Amended Complaint does not adequately allege that Whalen was personally involved in the constitutional violations; and (2) Whalen is entitled to qualified immunity. For the reasons outlined below, the Court concludes that, although the Amended Complaint fails to state a claim against Whalen based on the traffic citations, the allegations against him regarding the Code violations suffice to survive defendants' motion to dismiss.

#### 1. Personal Involvement

3

In order to state a plausible claim for relief under Section 1983, a plaintiff must allege the personal involvement of the defendant in the alleged constitutional deprivation. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). "Personal involvement" may be established by evidence of a supervisor's direct participation in the challenged conduct or "by evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut v. State Univ. of New York*, 352 F.3d 733, 753 (2d Cir. 2003). A supervisor can also be held liable where he "authorized or approved challenged misconduct." *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 602 (S.D.N.Y. 2011) (citing *Stevens v. New York*, 691 F. Supp. 2d 392, 400 (S.D.N.Y. 2009)). On the other hand, an "individual cannot be held liable for damages under Section 1983 merely because he held a high position of authority." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004). Where a Section 1983 claim fails to allege the personal involvement of the defendant, it fails as a matter of law. *See Johnson v. Barney*, 360 F. App'x 199, 201 (2d Cir. 2010).

Here, the Amended Complaint sufficiently alleges personal involvement by defendant Whalen with respect to the selective enforcement of the Code. First, plaintiffs' allegations indicate that Whalen "authorized or approved [the] challenged misconduct" by the building inspectors. *Bermudez*, 783 F. Supp. 2d at 602. Specifically, the Amended Complaint alleges that (1) the Village's building inspectors cannot issue summonses without obtaining approval from Whalen in his capacity as Superintendent of Buildings (Am. Compl. ¶ 65); (2) building inspectors must report any relevant violations of the Code to Whalen, who then decides whether any action will be taken (*id.* ¶ 66); and (3) it is listed in Whalen's job duties that he must determine against whom the Code will be enforced (*id.* ¶ 69). Although plaintiffs do not specifically allege that Whalen authorized the building inspectors' actions in this case, this allegation can be reasonably inferred from their other allegations, namely Rodrigues's receipt of the summonses and the process required for issuing them as outlined in the Amended Complaint. *See Cleveland*, 448 F.3d at 521 (on motion to dismiss, court must draw all reasonable inferences in plaintiff's favor). In other words, because building inspectors must obtain Whalen's approval before issuing a summons, it can be fairly inferred from plaintiff's receipt of a summons that Whalen approved it. This is sufficient to establish his personal involvement. *See, e.g.*, *Whiting v. Inc. Vill. of Old Brookville*, 79 F. Supp. 2d 133, 137 (E.D.N.Y. 1999) (holding that plaintiff adequately pled personal involvement where defendant, *inter alia*, "approv[ed] the charges filed by [a subordinate police officer]").

Furthermore, even if plaintiffs had not alleged that Whalen approved the summonses, the Amended Complaint still adequately alleges that he exhibited "deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut*, 352 F.3d at 753. In particular, plaintiffs assert that, when Rodrigues complained about unfair treatment, Whalen told him to "mind [his] own business." (Am. Compl. ¶¶ 18, 68.)

4

Such a response to the unlawful conduct of subordinates plainly is sufficient to demonstrate personal involvement to the extent necessary to survive a motion to dismiss. *See Hill v. Taconic Developmental Disabilities Servs. Office*, 283 F. Supp. 2d 955, 962 (S.D.N.Y.) (holding that plaintiff's Section 1983 claim survived summary judgment where defendant "exhibited deliberate indifference to the plaintiff's rights by failing to act on information indicating that her constitutional right to equal protection was being violated").

The Amended Complaint does not, however, contain any allegation from which it can be inferred that Whalen played a role in the issuance of traffic citations against Rodrigues. Therefore, the motion to dismiss the Amended Complaint is granted with respect to the claims against Whalen arising out of the traffic citations. *See Stevens*, 691 F. Supp. 2d at 401; *Raymond v. City of N.Y.*, No. 15-CV-6885-LTS-HBP, 2017 WL 892350, at *5 (S.D.N.Y. Mar. 6, 2017).

2. Qualified Immunity

Defendants next argue that Whalen is entitled to qualified immunity because the Amended Complaint does not allege he engaged in conduct that violated clearly established law. Under the doctrine of qualified immunity, government actors may be shielded from liability for civil damages if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) ("The police officers, in turn, are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law."). As the Second Circuit has noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)). Thus, qualified immunity is not merely a defense, but rather is also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the availability of qualified immunity should similarly be decided by a court "[a]t the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Nonetheless, the Second Circuit has emphasized that "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *see also McCray v. City of New York*, Nos. 03-CV-9685 (DAB), 03-CV-9974 (DAB), 03-CV-10080 (DAB), 2007 WL 4352748, at *18 (S.D.N.Y. Dec. 11, 2007) ("A defendant asserting a qualified immunity defense at the 12(b)(6) stage faces a formidable hurdle. Because the evidence supporting a finding of qualified immunity is normally adduced during the discovery process and at trial, the defense of qualified immunity [usually] cannot support the grant of a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim upon which relief can be granted." (citations and ellipsis omitted)). In particular, the facts supporting the defense must be clear from the face of the complaint. In addition, in such situations, "plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna*, 386 F.3d at 436. The burden is on the defendant to show "that the

challenged act was objectively reasonable in light of the law existing at that time." *Savino v. Town of Southeast.*, 983 F. Supp. 2d 293, 309 (S.D.N.Y. 2013) (quoting *Rosen v. City of New York*, 667 F. Supp. 2d 355, 362 (S.D.N.Y. 2009)).

Defendants emphasize that, to defeat qualified immunity, a plaintiff must show that "the violative nature of *particular* conduct is clearly established." (Defs.' Mem. Supp. Mot. to Dismiss Am. Compl., ECF No. 31 ("Defs.' Br."), at 13 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).). They further argue that the Amended Complaint does not specifically allege that Whalen approved the summonses with discriminatory intent, and, thus, fails to show that he violated clearly established law. (*Id.* at 13–14.)

As a threshold matter, "the prohibition against the application of a neutral law because of someone's race or national origin was previously established, as was the prohibition against selective enforcement of a law for the same reasons" well before Whalen's alleged approval of the summonses in this case. *Savino*, 983 F. Supp. 2d at 308 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886); *LeClair v. Saunders*, 627 F.2d 606, 610 (2d Cir. 1980)). Thus, in *Savino*, the court rejected a defendant's qualified immunity arguments on summary judgment where "a trier of fact could reasonably determine that [the defendant] applied the zoning laws against [the plaintiff] . . . because of [the plaintiff's] nationality." *Id.* The court further held that the jury "could reasonably conclude that [the defendant's] actions in enforcing the zoning code . . . were unreasonable in light of the aforementioned clearly established law." *Id.* In the event the jury made these factual findings, the court continued, it would be "unreasonable to believe that applying or enforcing a law based on someone's national origin does not violate the Fourteenth Amendment, and no official of reasonable competence would disagree." *Id.*

Here, as discussed in more detail below, plaintiffs have adequately alleged that Whalen selectively enforced the Code against them because of Rodrigues's nationality. Accordingly, given that the right against selective enforcement of a statue based on nationality was clearly established before Whalen approved the summonses, it would have been "unreasonable [for him] to believe that applying or enforcing a law based on someone's national origin does not violate the Fourteenth Amendment." *Id.* Accordingly, Whalen is not entitled to qualified immunity at this stage of the litigation.

B. Equal Protection

Plaintiffs' Equal Protection claim alleges that defendants violated their right to equal protection by selectively enforcing the Code against them because of Rodrigues's nationality. As set forth below, the Court concludes that the Amended Complaint adequately sets forth a selective enforcement claim.

The Second Circuit has "described selective enforcement as a 'murky corner of equal protection law in which there are surprisingly few cases.'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)). Nevertheless, it is well-settled that plaintiffs must meet a two-pronged test in order to successfully demonstrate selective enforcement under the Fourteenth Amendment. *Cine SK8 v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007). Specifically, "plaintiffs must show both (1) that [they were] treated differently from other similarly situated businesses and (2) that 'such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish

the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Id.* (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)).

1. Similarly Situated

First, "[a] selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated." *Church of the American Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004). In particular, a plaintiff must include allegations "comparing [himself] to individuals that are 'similarly situated in all material respects.'" *Sebold v. City of Middletown*, No. 3:05-CV-1205, 2007 U.S. Dist. LEXIS 70081, at *81 (D. Conn. Sept. 21, 2007) (*quoting Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). Nevertheless, "similarly situated does not mean identical, but rather a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, to the extent that an objectively identifiable basis for comparability exists. In other words, Plaintiffs must identify comparators whom a prudent person would think were roughly equivalent." *Savino*, 983 F. Supp. 2d at 305 (citations, brackets, and ellipses omitted); *see also Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011) ("To satisfy this less-demanding test in the selective enforcement context, plaintiffs 'must identify comparators whom a prudent person would think were roughly equivalent[, but] [p]laintiff[s] need not show an exact correlation between [themselves] and the comparators.'" (alterations in original)). Furthermore, "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury." *Harlen*, 273 F.3d at 499 n.2.

In *Riley v. Town of Bethlehem*, 44 F. Supp. 2d 451, 463 (N.D.N.Y. 1999), for example, the court held that a plaintiff produced adequate evidence to show that similarly situated individuals were treated differently to support her selective enforcement claim. In that case, the plaintiff's evidence indicated that numerous white homeowners openly operated businesses in residential areas without use variances, but the town only enforced its zoning ordinance against the plaintiff, a black woman. *Id.* at 462–63; *see also Mosdos*, 815 F. Supp. 2d at 697–98 (holding that other businesses the plaintiffs identified were "similarly situated" because the complaint alleged that their construction projects "were similar in size or scope to the [plaintiffs'] proposed development" yet the village permitted them "to proceed without requiring [environmental] compliance," which they had required from plaintiffs).

Here, plaintiffs have adequately identified "similarly situated" individuals and companies in the Amended Complaint that have not received frequent visits from inspectors or summonses for the same violations of the Code. (*See* Am. Compl. ¶¶ 18, 25–30.) In particular, the Amended Complaint lists six neighboring businesses that "operate outdoor storage facilities on their property without being frequently visited by village inspectors, despite the fact that many neighbors are operating without permits." (*Id.* ¶ 18.) Furthermore, although the Village issued a summons to plaintiffs for "allow[ing] for the accumulation of filth dirt, concrete dust and stones upon a public place" (*id.* ¶ 20), it did not do so for their neighbors even though Rodrigues "observed [them] spill concrete production material onto public streets" (*id.* ¶ 22; *see also id.* ¶ 25).

Furthermore, plaintiffs have identified similarly situated individuals not of Portuguese national origin who did not receive parking citations to the extent plaintiffs did.

7

Specifically, plaintiffs allege that, from September 2013 through February 2015, Rodrigues received over 25 parking citations for such conduct as double parking and improperly parking commercial vehicles. (*Id.* ¶¶ 34–55.) "Neighboring property owners," however, were not "issued tickets . . . despite engaging in the same behavior." (*Id.* ¶ 57.) Plaintiffs specifically cite "multiple unregistered and unlicensed vehicles" belonging to a neighboring property at 100 Windsor Avenue "that have been blocking the sidewalk for years" without receiving tickets. (*Id.* ¶ 59.) The owner of that property "is not of Portuguese national origin." (*Id.* ¶ 61.)

In short, plaintiffs have identified companies in the same area that operate the same type of business as plaintiffs and have engaged in the same unlawful activities for which plaintiffs received summonses and parking citations, but they did not receive similar treatment from the Village. The Court concludes that, if these allegations are credited, a "prudent person [c]ould think" plaintiffs "were roughly equivalent" to their neighbors. *Savino*, 983 F. Supp. 2d at 305; *see also Riley*, 44 F. Supp. 2d at 463; *Mosdos*, 815 F. Supp. 2d at 697.[2] Thus, the Amended Complaint states a plausible claim with respect to the first prong of the selective enforcement test.

2. Impermissible Motive

Under the second prong of the test, a plaintiff must demonstrate that the "differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cine SK8*, 507 F.3d at 790 (citations omitted); *see also Freedom Holdings Inc. v. Int'l Tobacco Partners, Ltd.*, 357 F.3d 205, 234 (2d Cir. 2004). "To prevail, plaintiffs must prove that the disparate treatment was caused by the impermissible motivation." *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005). One impermissible motive is a discriminatory purpose, which "implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of . . . its adverse effects upon an identifiable group." *Adler v. Kent Vill. Hous. Co.*, 123 F. Supp. 2d 91, 98 (E.D.N.Y. 2000) (quoting *Estate of Rosenbaum by Plotkin v. City of N.Y.*, 975 F. Supp. 206, 223 (E.D.N.Y. 1997)).

In *Thomas v. Venditto*, 925 F. Supp. 2d 352, 365 (E.D.N.Y. 2013), for instance, the court held that the plaintiffs adequately set forth an impermissible purpose where the complaint alleged that "at least seven other homes in [the] [p]laintiffs' neighborhood [were] being used illegally as multi-family homes, [but] criminal charges [were] only . . . brought against Mr. Thomas." It further alleged that "each of the comparators was Caucasian, whereas Mr. Thomas is African American and Mrs. Thomas is Puerto Rican." *Id.* Thus, the court concluded that

---

[2] Defendants argue that plaintiffs are not similarly situated to their neighbors because plaintiffs entered into a stipulation with the Village that permitted the Village to conduct regular inspections. (Defs.' Br. at 8.) They also point out that plaintiffs were convicted of illegally operating a concrete mixing plant prior to signing the stipulation. (*Id.*) These distinctions are not, however, enough for the Court to conclude, as a matter of law, that plaintiffs' Equal Protection claim fails. First, the Amended Complaint alleges that at least one other neighbor, D&A, also illegally operates a concrete mixing plant at 328 Sagamore (*id.* ¶ 28, 30), so plaintiffs' alleged illegal operation of a concrete facility is insufficient, at this stage, to distinguish all of their non-Portuguese neighbors. Second, even if no other company had engaged in the alleged unlawful conduct, "plaintiffs need not show an exact correlation between themselves and the comparators," as noted above. *Mosdos*, 815 F. Supp. 2d at 696. Thus, in this case, these purported dissimilarities do not allow this issue to be resolved on a motion to dismiss.

"the Complaint allege[d] that Defendants' enforcement of the Town Code is racially motivated." *Id.*; *see also Tower Properties LLC v. Vill. of Highland Falls*, No. 14-CV-04502 NSR, 2015 WL 4124499, *9–12 (S.D.N.Y. July 7, 2015) (complaint adequately alleged impermissible purpose where it set forth differential treatment and racially suggestive statements made by mayor); *Purdie v. Brown*, No. 14 CIV. 8490 NSR, 2015 WL 6741875, at *7 (S.D.N.Y. Nov. 3, 2015) (complaint adequately alleged discriminatory motive where "Plaintiff alleged the arrests of two African–American police officers; humiliating treatment following his arrest; and a number of non-AfricanAmerican [sic] comparators who were not arrested").

Here, as in *Thomas*, plaintiffs have adequately identified other businesses that have allegedly engaged in the same type of conduct as plaintiffs but did not receive the same treatment. Furthermore, also like in *Thomas*, plaintiffs have alleged that the owners of these businesses are of a different national origin. (Am. Compl. ¶ 19.) At this early stage of the proceedings, the Court concludes that these allegations set forth a plausible claim with respect to the second prong of the selective enforcement test. *See Thomas*, 925 F. Supp. 2d at 365; *see also Collins v. W. Hartford Police Dep't*, 380 F. Supp. 2d 83, 93 (D. Conn. 2005) ("[I]n light of the liberal pleading requirements of Fed. R. Civ. P. 8, disposition of a selective enforcement claim at the motion to dismiss stage should be done only with great circumspection."); *see, e.g.*, *Rizvi v. Town of Wawarsing*, No. 112CV1396GLSRFT, 2013 WL 12177175, at *5 & n.10 (N.D.N.Y. Jan. 15, 2013) (declining to dismiss where plaintiff simply "allege[d] that the Town is only applying the licensing requirements on the Motel, and the impetus behind this selective enforcement is her protected characteristics" despite "gaps in these allegations" because

"the court presume[d] that [plaintiff] possesse[d] the requisite good faith belief that discovery will confirm her allegations of selective enforcement"); *Bissinger v. City of N.Y.*, No. 06 CIV. 2325 (WHP), 2007 WL 2826756, at *9 (S.D.N.Y. Sept. 24, 2007) (plaintiffs adequately alleged selective enforcement claim where they alleged that "along with other photograph vendors, they were arrested, ticketed, and harassed when legally selling photographs, while other vendors, selling at the same times and places, were not"); *Vertical Broad., Inc. v. Town of Southampton*, 84 F. Supp. 2d 379, 390 (E.D.N.Y. 2000) (declining to dismiss "equal protection claim [that was] not sufficiently factually developed at this juncture [motion to dismiss] for full analysis").

\* \* \*

In sum, plaintiffs have asserted a plausible selective enforcement claim, adequately alleging similarly situated comparators of a different national origin who were treated differently. Therefore, defendants' motion to dismiss their Equal Protection claim based on the issuance of the summonses is denied.

C. Municipal Liability

Defendants also move to dismiss plaintiffs' Section 1983 claim for municipal liability against the Village under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694–95 (1978). Plaintiffs argue that the Village is liable for Whalen's actions with respect to the building violations because Whalen is a "final policymaker" for the Village.

The Second Circuit has held that a plaintiff may demonstrate municipal liability under *Monell* by showing that a municipal "policymaker" violated plaintiff's constitutional rights:

9

> Where plaintiffs allege that their rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy, or by a [municipal] employee's single tortious decision or course of action, the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself. Such an action constitutes the act of the municipality and therefore provides a basis for municipal liability where it is taken by, or is attributable to, one of the [municipality's] authorized policymakers.

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004); *see also Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) ("Municipal liability may attach under § 1983 when a [municipal] policymaker takes action that violates an individual's constitutional rights."); *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002) ("A plaintiff can show a municipal custom, policy or practice by establishing that an official who is a final policymaker directly committed or commanded the constitutional violation. . . . ."). Indeed, "[e]ven one episode of illegal retaliation may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy." *Gronowski*, 424 F.3d at 296; *see also Amnesty Am.*, 361 F.3d at 126 ("Thus, even a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered' is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." (citation omitted) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986))). "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law. . . . The relevant legal materials[] include state and local positive law, as well as custom or usage having the force of law." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000), *cert. denied*, 531 U.S. 813 (2000) (citations omitted). Specifically, "'[t]he matter of whether the official is a final policymaker under state law is to be resolved by the trial judge *before* the case is submitted to the jury.'" *Richardson v. Metro. Dist. Comm'n*, No. 3-00-CV-1062 (JCH), 2003 U.S. Dist. LEXIS 12757, at *20 (D. Conn. July 23, 2003) (quoting *Jeffes*, 208 F.3d at 57).

Furthermore, where a municipal official "'has final authority over significant matters involving the exercise of discretion,' his choices represent government policy." *Gronowski*, 424 F.3d at 296 (quoting *Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)); *see also Diodati v. City of Little Falls*, No. 6:04-CV-446 (FJS/DEP), 2007 U.S. Dist. LEXIS 4322, at *6 (N.D.N.Y. Jan. 18, 2007) ("A policymaker is an individual whose 'decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions.'" (quoting *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003)). Moreover, "the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy *in that area* of the [municipality's] business." *Jeffes*, 208 F.3d at 57. "Thus, the court must ask whether [the] governmental official [is a] final policymaker[] for the local government in a particular area, or on [the] particular issue involved in the action." *Id.*; *see also Doe v. City of Waterbury*, 453 F. Supp. 2d 537, 543

(D. Conn. 2006) ("The critical inquiry is not whether an official *generally* has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit."). However, "[a]lthough the official in question does not have to be a final policymaker for all purposes, but only with respect to the conduct challenged, simply exercising discretion in an area where that official is not the final policymaker under state law cannot, by itself, establish municipal liability." *Barry v. N.Y. City Police Dep't*, No. 01 Civ. 10627 (CBM), 2004 U.S. Dist. LEXIS 5951, at *43 (S.D.N.Y. Apr. 6, 2004); *see also Diodati*, 2007 U.S. Dist. LEXIS 4322, at *6 ("An individual who merely has discretion to handle a particular situation is not a policymaker."); *Richardson*, 2003 U.S. Dist. LEXIS 12757, at *20 ("Mere discretion in the performance of his duties is not sufficient. However, the official need only have the power to make official policy on a particular issue."). On the other hand, where a policymaker "exceeded the bounds of the authority granted to him," his actions "cannot be fairly said to represent official policy." *City of Waterbury*, 453 F. Supp. 2d at 544 ("[A]lthough Giordano is generally a final policymaker for Waterbury, Giordano's specific actions in this case cannot be fairly said to represent official policy, because under state law, he exceeded the bounds of the authority granted to him.").

Defendants argue that the Village vests its Board of Trustees with final policymaking authority, and that, as Superintendent of Buildings, Whalen is only "responsible for enforcing certain provisions of this Code." (Defs.' Br. at 15 (quoting Vill. of Mineola Code § 115-15).) From this, they argue that he cannot qualify as a "final policymaker" for purposes of *Monell* liability.

The Court disagrees. Courts routinely hold that an official with final enforcement authority qualifies as a "final policymaker" for *Monell* purposes. For example, in *New Creation Fellowship of Buffalo v. Town of Cheektowaga, N.Y.*, No. 99-CV-460A(F), 2004 WL 1498190, at *64 (W.D.N.Y. July 2, 2004), the court held that a building inspector qualified as a "final policymaker" with respect to a particular ordinance where that ordinance stated that it was to be "administered and enforced by the Town Building Inspector." The court reasoned, "as the Town has by ordinance delegated to its Building Inspector, Ulatowski, sole responsibility for enforcement of the . . . Ordinance, it follows that Ulatowski is a final policymaker . . . under the *Monell* doctrine." *Id.* The fact that a party could appeal a decision of the Building Inspector to the Town Board did not alter the court's conclusion. *Id.*; *see also, e.g.*, *Kern v. Layne*, No. 06CIV.13490(GAY), 2009 WL 4884149, at *1 (S.D.N.Y. Dec. 16, 2009) ("[B]ased upon the scope of authority vested in the Building Inspector under the Village Code with respect to building permits and certificates of occupancy, defendant Layne is a final municipal policymaker for purposes of establishing municipal liability under § 1983."); *Rodriguez v. Margotta*, 71 F. Supp. 2d 289, 298 (S.D.N.Y. 1999) (indicating that an official would qualify as a final policymaker if he is "empowered to write the building code, set policy for enforcement of the code, or to bring about prosecutions under the code"); *Town of Orangetown v. Magee*, 665 N.E.2d 1061, 1068 (N.Y. 1996) (holding that a "Building Inspector . . . implement[ed] Town Policy" where the zoning code "vest[ed] the Building Inspector, alone, with the authority to revoke building permits").

Here, the Amended Complaint adequately alleges that Whalen is a final policymaker. Specifically, plaintiffs allege that Whalen has the final say in whether sum-

monses shall issue for certain violations of the Code. (*See* Am. Compl. ¶ 66 ("[B]uilding inspectors must report any possible violations to Defendant DANIEL WHALEN, who then issues the decision on what action if any is to be taken.").) Thus, like the ordinance in *New Creation Fellowship*, the Village's Code "delegate[s] to [Whalen] sole responsibility for enforcement of the" provisions at issue in this litigation. 2004 WL 1498190, at *64. Moreover, there is nothing in the Village's Code, much less the Amended Complaint, to suggest that Whalen's decisions are subject to an appeal to the Village's Board, thus making this case even more straightforward than *New Creation Fellowship*. *See* 2004 WL 1498190, at *64 (holding that a building inspector was still a final policymaker even though his decisions were subject to appeal). In short, plaintiffs have a plausible claim that the Code affords Whalen the power "to bring about prosecutions under the code" by finally approving summonses, *Margotta*, 71 F. Supp. 2d at 298, thus making him a final policymaker "with respect to the conduct challenged" in the relevant area of the Village's business, *Jeffes*, 208 F.3d at 57.³ Ac-

cordingly, the motion to dismiss the Section 1983 claim against the Village is denied.

IV. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted with respect to the claims (1) against Mayor Strauss, (2) based on the 2006 summons, and (3) against Whalen to the extent they stem from the parking citations. The motion is denied as to the claims against Whalen and the Village regarding the summonses for the building violations and as to the Village regarding the parking citations.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 16, 2016
      Central Islip, NY

\*\*\*

Plaintiffs are represented by Jonathan A. Tand and Gary R. Novins, Tand & Associates, 990 Stewart Avenue, Suite 130, Garden City, NY 11530. Defendants are represented by Steven C. Stern, Kevin Levine, and Susan Hull Odessky, Sokoloff Stern LLP, 179 Westbury Avenue, Carle Place, NY 11514.

---

³ With respect to the parking citations, defendants only argue that plaintiffs have not adequately asserted "final policymaker liability" to support a *Monell* claim. The Court concludes, however, that the Amended Complaint sufficiently alleges a different basis for *Monell* liability in regards to the parking citations, namely that the Village has "a longstanding practice or custom" of national origin discrimination in the issuance of such citations. *Hurdle v. Bd. of Educ. of City of N.Y.*, 113 F. App'x 423, 425 (2d Cir. 2004); *see also Donohue v. Manetti*, No. 15-CV-636 (JFB)(GRB), 2016 WL 740439, at *5 (E.D.N.Y. Feb. 24, 2016) (summarizing applicable standard for *Monell* liability based on a municipal policy or custom). In particular, the Amended Complaint contains detailed factual allegations of over 20 citations Rodrigues received between 2013 and 2015 that his non-Portuguese neighbors did not receive even though they engaged in the same conduct. (*See* Am. Compl. ¶¶ 34–63.) This is sufficient, at this stage, to state a *Monell* claim against the Village with respect to the parking citations. *See Donohue*, 2016 WL 740439, at *5 ("[T]o survive a motion to dismiss, plaintiff cannot merely allege the existence of a municipal policy or custom, but 'must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists.'" (quoting *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012))).